FILED
United States Court of Appeals
Tenth Circuit

April 30, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROOSEVELT RICO DAHDA,

    Defendant - Appellant.

No. 19-3285
(D.C. No. 2:12-CR-20083-KHV-2)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

Roosevelt Dahda and 42 others faced criminal charges related to a marijuana-distribution network between California and Kansas. A jury convicted Roosevelt on ten counts arising out of this operation.[1] The district court sentenced him to a total of 201 months' imprisonment as follows: 201 months on Counts 1 and 56; 120 months on Counts 43, 49, and 73; and 48 months on Counts 42, 45, 53, 55, and 70, all to be served concurrently. The court also ordered forfeiture in the amount of $16,985,250.00. Roosevelt appealed both his conviction and sentence to this court.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] In keeping with this court's prior opinions, we refer to Roosevelt by his first name. _See United States v. Dahda_, 852 F.3d 1282, 1287 n.1 (10th Cir. 2017).

*See Dahda*, 852 F.3d at 1287. We affirmed his conviction but remanded for resentencing "based on the error in calculating the amount of marijuana attributable to Roosevelt." *Id.* at 1298.

On remand, the district court resentenced Roosevelt to a total of 141 months' imprisonment as follows: 141 months on Counts 1 and 56; 120 months on Counts 43, 49, and 73; and 96 months on Counts 42, 45, 53, 55, and 70, all to run concurrently. To reach this revised sentence, the district court adopted the presentence report, which provided the following explanation. First, the PSR grouped the counts of conviction pursuant to U.S.S.G. § 3D1.2(d). It then attributed 505.8 kilograms of marijuana to Roosevelt, corresponding with a base offense level of 26. The PSR added three levels because Roosevelt was a manager or supervisor in the criminal venture, pursuant to U.S.S.G. § 3B1.1(b). Based on a total offense level of 29 and a criminal history category of 3, the PSR calculated an advisory guideline range of 108 to 135 months' imprisonment. The district court varied upward from the low end of the guideline range by 33 months. Thus, the court imposed a 141-month sentence on Counts 1 and 56, and the lower statutory maximum sentences on the remaining counts, all to run concurrently.

This appeal followed. Roosevelt argues the district court erred: (I) by increasing the statutory maximum sentences on Counts 56, 43, 49, and 73 pursuant to 21 U.S.C. § 851; (II) by sentencing him under 21 U.S.C. § 841(b)(1)(C) rather than § 841(b)(1)(D) on Count 1; (III) in reapplying its 33-month upward variance to the advisory guideline range; (IV) in calculating the amount of marijuana attributable to

2

him when determining his base offense level; and (V) in pronouncing special conditions of supervised release without adequate findings to support them. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

We turn first to Roosevelt's claim that the district court erred in increasing the statutory maximum sentences on Counts 56, 43, 49, and 73 based on the Government's § 851 information. Section 851 permits the Government to seek an enhanced sentence based on a defendant's prior convictions if it files an information prior to trial. 21 U.S.C. § 851. Here, the parties do not dispute that the Government filed an information prior to trial. But Roosevelt contends that he objected to that § 851 information at his initial sentencing, and given those objections, the Government withdrew the information. Roosevelt thus argues that the Government should have been prohibited from relying on the § 851 information to enhance his sentence during resentencing. We review the legality of a sentence de novo. *United States v. Jones*, 235 F.3d 1231, 1235 (2000).

To determine whether the Government withdrew the § 851 notice, we must review what happened at Roosevelt's initial sentencing. During the proceeding, the Government explained that it believed Roosevelt could be sentenced under 21 U.S.C. § 841(b)(1)(A) on Count 1 (which provides for a mandatory minimum sentence of 10 years) because he was convicted of conspiracy to distribute more than 1,000 kilograms of marijuana. Roosevelt maintained, however, that he should be sentenced under § 841(b)(1)(C) because the jury did not make a specific finding about drug

3

quantity. Section 841(b)(1)(C) contains no mandatory minimum. To reduce the issues for appeal, the Government acquiesced to Roosevelt's demand that he be sentenced under § 841(b)(1)(C) on Count 1. Though § 841(b)(1)(C) contains no mandatory minimum, Roosevelt's guideline range was still 135 to 168 months—a sentence over 10 years with which the Government was comfortable. Because the Government agreed to sentence Roosevelt under § 851(b)(1)(C) on Count 1, so no mandatory minimum sentence applied, the Government explained that it believed the § 851 information had no impact on the sentence for Count 1. Thus, although the Government believed it was "on firm ground" with the § 851 information, it took the notice "off the table."

Contrary to Roosevelt's argument, the Government did not withdraw the § 851 information altogether. The Government merely acknowledged the § 851 enhancement would be irrelevant as to Count 1 if Roosevelt was sentenced under § 851(b)(1)(C). Roosevelt's counsel at the initial sentencing seemed to understand the same. When asked what he thought about the Government's approach, counsel responded, "I would agree that (b)(1)(C) is the appropriate provision under section 841." And when the court asked, "given the Government's concession of that issue, then your objection to the enhancement information [is] moot, right[,]" counsel responded, "Yes, your honor." It is clear throughout this dialogue that the parties and the court were discussing the § 851 enhancement as it applied to Count 1.

What's more, the district court in fact relied on the enhancement when sentencing Roosevelt on the remaining counts during the initial sentencing. For

4

example, the original judgment reflects that the court sentenced Roosevelt to 201 months' imprisonment on Count 56—a sentence that could only be achieved as a result of the § 851 information. To reach a sentence of 201 months, the court had to rely on the enhanced penalty provisions in § 841(b)(1)(D)—which doubled the 5-year maximum to 10 years—which was then doubled again by § 860(a), to a maximum of 20 years. If the § 851 notice had been withdrawn, the court could not have imposed a 201-month sentence.

In sum, given the dialogue at Roosevelt's original sentencing, as well as the court's reliance on the § 851 information to sentence Roosevelt on Count 56, the Government did not withdraw the § 851 notice but rather acknowledged it was immaterial to Count 1. This conclusion was bolstered at resentencing wherein the Government reiterated its position that it believed the § 851 information does not apply to Count 1 but that it "is still in play and still does affect various statutory penalties in this case." And the court agreed, telling defense counsel that he could "raise [his argument that the § 851 notice was withdrawn] with the Court of Appeals." While Roosevelt suggests the Government's conduct denied him the opportunity to contest the substance of § 851 notice, he could have raised objections to the information at resentencing when it became apparent the district court would again rely on the § 851 notice to sentence Roosevelt on the remaining counts. Accordingly, given the initial sentencing and Roosevelt's opportunity to contest the § 851 information at resentencing, we reject Roosevelt's claim that the Government

5

withdrew its § 851 information. We affirm the 141-month sentence on Count 56 and the 120-month sentences on Counts 43, 49, and 73.

## II.

Roosevelt next argues that the district court erred in sentencing him under 21 U.S.C. § 841(b)(1)(C) as opposed to § 841(b)(1)(D) on Count 1. We do not address Roosevelt's challenge because he was sentenced to 141 months' imprisonment on both Count 1 and Count 56, to run concurrently. We already affirmed Roosevelt's sentence on Count 56, and therefore, he suffers no prejudice as a result of the sentence imposed on Count 1. Pursuant to the concurrent-sentence doctrine, we decline to review his challenge. *See United States v. Harris*, 695 F.3d 1125, 1139 (10th Cir. 2012).

## III.

Third, Roosevelt argues the district court erred in re-imposing a 33-month upward variance at resentencing. Roosevelt acknowledges he presents a new argument on appeal, and therefore, we review for plain error. To establish plain error, Roosevelt must show (1) error, (2) that is plain, (3) that affects his substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Yurek*, 925 F.3d 423, 445 (10th Cir. 2019). Roosevelt has not shown that the district court erred.

Roosevelt's claim of error is based on the following. During his initial sentencing, the district court imposed a 33-month upward variance because the PSR did not hold Roosevelt accountable for obstruction of justice. Specifically, the court

6

found that Roosevelt threatened, intimidated, or unlawfully influenced his codefendant, Sadie Brown, such that Ms. Brown declined to help the Government and no longer qualified for a safety valve reduction under U.S.S.G. § 5C1.2(a)(5). Because she didn't qualify for the safety valve adjustment, the court determined she was serving between 12 and 33 additional months in prison. The court concluded that Roosevelt was "legally and morally" responsible for the additional time Ms. Brown was serving and varied upward 33 months to account for that time. The court also reasoned that if Roosevelt's offense level had included "the obstruction of justice [enhancement], [he] would have been at a [total offense] level [of] 33 which calls for a custody range of 168 to 210 months." Because 201 months was "squarely within the middle of that," the court concluded the 33-month upward variance, bringing his sentence from 168 months to 201 months, was appropriate.

At resentencing, the district court reapplied the 33-month upward variance "for the reasons that [it] already stated and previously imposed." The problem with this ruling, according to Roosevelt, is that between Roosevelt's sentencing and resentencing, Ms. Brown filed a motion pursuant to 28 U.S.C. § 2255 and received a 50-month sentence reduction as a result. As part of Ms. Brown's resentencing, the Government and court treated Ms. Brown as if she did in fact qualify for the safety valve adjustment. Roosevelt contends he should no longer have received an upward variance for his conduct in threatening Ms. Brown because she ultimately received the safety valve adjustment.

7

Roosevelt's argument is without merit. The court originally explained it varied upward on Roosevelt's sentence because he obstructed justice. While the 33-month variance was calculated in part based on the additional time Ms. Brown was serving, it also accounted for the fact that, had Roosevelt received an obstruction of justice enhancement, his adjusted guideline range would encompass the 33-month upward variance. Like the district court explained at the original sentencing, if the court imposed the obstruction of justice enhancement it believed Roosevelt qualified for, Roosevelt's guideline range at resentencing would have been 135 to 168 months. Applying the court's reasoning at Roosevelt's initial sentencing, the new 141-month sentence he received at resentencing falls "squarely within the middle of that." Accordingly, the district court committed no error, much less plain error, when it again applied a 33-month upward variance at resentencing.

IV.

Roosevelt's fourth claim is that the district court again erred in calculating the amount of marijuana attributable to him for the purpose of determining his base offense level. At his initial sentencing, the court attributed 1,600 pounds, or 725.7 kilograms, of marijuana to Roosevelt. At resentencing, the district court drastically reduced that amount, attributing 1,115 pounds, or 505.8 kilograms, of marijuana to Roosevelt. Nonetheless, Roosevelt maintains the district court erred in two ways. First, he argues the court erred in concluding that 9 of the 20 crates shipped during the venture contained 80 pounds of marijuana. Second, he contends the court erred

8

by failing to account for testimony that 20%–30% of the crates contained no marijuana at all.

"We review the district court's factual finding concerning the quantity of drugs for which a defendant may be held accountable under a clearly erroneous standard." *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993). [2] The Government bears the burden of proving the drug quantity by a preponderance of the evidence. *Dahda*, 852 F.3d at 1294. The drug calculation may be an estimate "if it contains some record support and is based on information bearing 'a minimum indicia of reliability.'" *Id.* (quoting *United States v. Garcia*, 994 F.2d 1499, 1508 (10th Cir. 1993)).

We turn first to Roosevelt's claim that the district court erred in finding 9 of the 20 crates attributable to him contained 80 pounds of marijuana. The district court reached this conclusion by adopting the findings in the PSR, which explained the following. First, the PSR highlighted testimony from Roosevelt's codefendant, Chad Bauman. Mr. Bauman testified that they shipped crates that contained up to four boxes of marijuana at the bottom, and the boxes would be covered by wheels. Each box could hold up to 20 pounds of marijuana, and each crate would have 5 or 10 pounds to 80 pounds of marijuana in it. Mr. Bauman explained that the 5- or 10-pound shipments occurred early in the venture. While he didn't describe what he considered to be early in the venture,

---

[2] While Roosevelt objected to the drug quantity calculation in the district court, his objection was made, at least in part, on different grounds. He therefore seeks plain-error review. But even if Roosevelt had preserved his argument, it would fail because the district court's factual finding as to the quantity of drugs attributable to Roosevelt is not clearly erroneous.

the PSR identified the venture as beginning in spring 2009 and ending in May 2012. Therefore, the PSR concluded that the shipments at issue—occurring on December 13, 2010; December 16, 2011; July 21, 2011; and February 9, 2012—were not "early" in the venture.

To reach the 80-pound estimate for 9 of the crates, the PSR calculated that for each shipment of more than one crate, all but one of the crates shipped contained 80 pounds of marijuana. This estimate was based on testimony from Wayne Swift, another one of Roosevelt's codefendants. Mr. Swift testified that there was "no reason to ship out two crates at a time" unless they needed to ship more than four boxes of marijuana. This testimony is supported by what the PSR called "good business sense," as the co-conspirators would have to pay to ship each crate, and so, it was advantageous to fill the crates entirely before shipping an additional crate. As to the challenged shipments, the PSR calculated as follows:

| Date | Number of Crates | Weight Per Crate | Total Weight |
|---|---|---|---|
| 12/13/2010 | 4 | 1: 80 pounds<br>2: 80 pounds<br>3: 80 pounds<br>4: 20 pounds | 260 pounds |
| 3/16/2011 | 4 | 1: 80 pounds<br>2: 80 pounds<br>3: 80 pounds<br>4: 20 pounds | 260 pounds |
| 7/21/2011 | 3 | 1: 80 pounds<br>2: 80 pounds<br>3: 20 pounds | 180 pounds |
| 2/9/2012 | 2 | 1: 80 pounds<br>2: 20 pounds | 100 pounds |

10

Roosevelt objects to this calculation because Mr. Swift's testimony was that he and Roosevelt only completed one shipment of multiple crates—the shipment on February 9, 2012. And while Mr. Swift confirmed that they sent 100 pounds of marijuana in that shipment (80 pounds in one crate and 20 in the other) Roosevelt maintains the district court erred in extrapolating that testimony to *every* shipment of multiple crates.

We are not persuaded. As the PSR noted, it makes logical sense that the co-conspirators would not simultaneously ship a second crate unless the first crate was full. It makes little sense to ship two crates at once if the marijuana shipped could fit into a single crate. Combined with Mr. Swift's testimony that this was in fact their practice on at least one occasion, the court's drug calculation contains "some record support and is based on information bearing 'a minimum indicia of reliability.'" *Dahda*, 852 F.3d at 1294 (quoting *Garcia*, 994 F.3d at 1508). Accordingly, we conclude the district court did not clearly err in finding that 9 of the 20 crates contained 80 pounds of marijuana.

Turning to Roosevelt's second claim as to the amount of marijuana attributable to him, he contends the district court erred because it failed to account for testimony that between 20% and 30% of the crates shipped from California to Kansas contained no marijuana. Roosevelt's argument misconstrues the record. Mr. Bauman testified that he shipped crates for some other purpose than his marijuana business 20% to 30% of the time. But on redirect, counsel asked him, "Was there ever, to your knowledge, a single crate shipped from California to Kansas that would have had nothing but legitimate items in it?" to which Mr. Bauman responded, "No." And when asked if everything coming

11

from California to Kansas had drugs in it, Mr. Bauman said, "Yes." The district court only attributed shipments from California to Kansas to Roosevelt. Therefore, the district court should not have reduced—and certainly did not clearly err in failing to reduce—the shipments by 20% to 30%.

In sum, the court did not clearly err in attributing 1,115 pounds of marijuana to Roosevelt for the purpose of calculating his base offense level. The court's estimation finds "record support and is based on information bearing 'a minimum indicia of reliability.'" *Dahda*, 852 F.3d at 1294 (quoting *Garcia*, 994 F.3d at 1508).

## V.

Finally, Roosevelt argues that the district court failed to make adequate findings to support three special conditions of supervised release requiring Roosevelt to submit to: (1) behavioral treatment; (2) substance abuse monitoring/treatment; and (3) warrantless search of his electronic devices.

First, Roosevelt waived his claim that the district court made inadequate findings to support the behavioral and substance abuse treatment conditions. Waiver occurs when "a party intentionally relinquishes or abandons an argument in the district court." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). Before the district court at resentencing, counsel asked to "address [his] objections to the special conditions of supervised release." When the court asked him to "talk about them individually" and explain "what [counsel] wanted to argue here in court[,]" counsel replied, "just the objection as to the search of electronic devices." Roosevelt thus intentionally

12

relinquished his objections to the behavioral and substance abuse treatment conditions, and we decline to consider any argument regarding those conditions on appeal. *See id.*

Turning to his third objection, as to the search of his electronic devices, Roosevelt argues the district court failed to make the particularized findings necessary to support a special condition that restricts a fundamental liberty interest—here, his Fourth Amendment interest against unreasonable search and seizure. The search condition provides:

> The defendant shall submit his/her person, house, residence, vehicle(s), papers, business or place of employment and any property under the defendant's control to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

We review the imposition of conditions of release for an abuse of discretion. *United States v. Martinez-Torres*, 795 F.3d 1233, 1236 (10th Cir. 2015). The condition must: (1) be reasonably related to the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public, or the defendant's educational, vocational, medical, or other correctional needs; (2) involve no greater deprivation of liberty than is reasonably necessary; and (3) be consistent with any policy statements issued by the Sentencing Commission. 18 U.S.C. § 3583(d). If the district court imposes a special condition, it must also explain how, with regard to the specific defendant being sentenced, the special condition satisfies the statutory requirements. *United States v. Koch*, 978 F.3d 719, 725 (10th Cir. 2020).

13

Typically, the court need only provide a "generalized statement of its reasoning" for imposing the special condition. *See United States v. Hahn*, 551 F.3d 977, 982 (10th Cir. 2008). But if the special condition infringes upon a fundamental right or liberty interest, the court must make particularized findings and justify the condition with compelling circumstances. *Koch*, 978 F.3d at 725.

Here, without citing any authority, Roosevelt claims the search condition infringes upon his fundamental liberty interest under the Fourth Amendment. The Government, on the other hand, argues the opposite—likewise, not citing any authority.[3] From our review, we have only once addressed this issue. *See United States v. Perez*, 666 F. App'x 735, 738 (10th Cir. 2016) (unpublished). There, addressing the same search condition, we held:

> Every condition of supervised release restricts liberty to some degree. Yet not every restriction affects a fundamental interest requiring particularized findings. In this case, Perez identifies no 'fundamental' interest that the special condition restricts. This means the district court was only required to set forth enough on the record to satisfy us that it had 'a reasoned basis for exercising [its] own legal decisionmaking authority.'

*Id.* (citing *Rita v. United States*, 551 US. 338, 356 (2007)). Although *Perez* is unpublished and therefore not binding on this panel, we agree that the search condition does not infringe upon Roosevelt's Fourth Amendment liberty interest.

---

[3] Given the parties' deficient briefing of this issue, we have declined to publish this opinion. As always, then, we create no binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. While this order and judgment may be cited for its persuasive value, we leave the issue of whether the search condition infringes on a fundamental liberty interest for a future panel to decide anew.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "basic purpose" of the Amendment "is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). To that end, the Fourth Amendment protects against unreasonable searches such that searches typically must be conducted pursuant to a warrant and supported by probable cause. *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). But exceptions to the general rule are many—for example, government employers may conduct warrantless, work-related searches of employees' desks without probable cause, school officials may conduct warrantless searches of some student property without probable cause, and in certain circumstances, government investigators can conduct searches pursuant to a regulatory scheme without adhering to the usual warrant or probable-cause requirement so long as the search meets reasonable legislative or administrative standards. *Id.* (internal citations omitted).

Supervision of a probationer is just another scenario which may justify departure from the usual warrant and probable-cause requirement. *Id.* at 873–74. "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotations omitted). Consistent with this principle, the Supreme Court has regularly advised us that probationers and parolees do not maintain the same privacy interest afforded an average citizen. *See Samson v. California*, 547 U.S. 843, 849 (2006) (concluding that parolees have a "substantially diminished expectation of privacy");

15

*Knights*, 534 U.S. at 119–20 (explaining that an individual's status as a probationer informs the degree of his privacy interest); *Griffin*, 483 U.S. at 875 (holding that supervision is a special need of the state "permitting a degree of impingent upon privacy that would not be constitutional if applied to the public at large.").

Our own precedent confirms the same. In *Banks v. United States,* we explained that those on conditional release—including those on probation, parole, and supervised release—maintain fewer Fourth Amendment liberty interests. 490 F.3d 1178, 1186–87 (10th Cir. 2007). While we did not differentiate between the types of conditional release and the corresponding privacy rights, the *Samson* Court instructed us that on the "continuum of state-imposed punishments . . . parolees have fewer expectations of privacy than probationers." *Samson*, 547 U.S. at 850 (internal quotations and citations omitted). And those on supervised release maintain privacy rights more akin to parolees. *Id.* (citing *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002)). As a person on supervised release, then, Roosevelt will have a significantly diminished expectation of privacy under the Fourth Amendment.

At bottom, the Fourth Amendment requires reasonableness. *See Knight*, 534 U.S. at 118. The search condition at issue here requires any search be conducted at a reasonable time, in a reasonable manner, and based upon reasonable suspicion. Given these limitations, and because Roosevelt will be a person on supervised release with "significantly diminished privacy interests," we conclude the search condition is reasonable and therefore does not impinge upon his Fourth Amendment liberty interest. *Knights*, 534 U.S. at 121.

16

Having determined that the search condition does not infringe upon a fundamental liberty interest, we turn to whether the district court provided a "generalized statement of its reasoning" for imposing the special condition. *See Hahn*, 551 F.3d at 982. We conclude that it did. In response to Roosevelt's objection to the special condition, the Government argued:

> This was a Title III wiretap investigation. [There was] [o]verwhelming evidence that the defendant used his cell phone, at least one cell phone, I think it was more than one cell phone, in communicating both orally and texting about the distribution of marijuana. So here, there's a direct relation to this special condition to allow his probation office to do a search of his phone, you know, with the limitations that are within that condition. And it is directly related to the crime here. And it also satisfies the two other criteria which it involves no greater deprivation of liberty than is reasonably necessary for the purposes of 3553(a) as outlined and it's consistent with the policy statements . . . set out by the Sentencing Commission.

The court adopted the Government's position explaining:

> I think the government's position is well-taken. I mean, in some cases, we don't let people on supervision even use electronic communication devices. So this isn't taking away his right to use them, but they would be subject to search. That seems like a reasonable balance to strike . . . I agree with the government's analysis of this. And here, the use of electronic communication devices was inherently part of the criminal conviction.

The court's adoption of the Government's position along with its own independent explanation provides sufficient reasoning to impose the special search condition. Accordingly, because the court made adequate findings to support the search condition, and Roosevelt waived his challenge to the behavioral and drug treatment conditions, the district court did not err in imposing the special conditions.

17

## VI.

For the reasons provided, we reject Roosevelt's challenges to his sentence and affirm the judgment of the district court.

Entered for the Court


Bobby R. Baldock
Circuit Judge